## VIDAL et al. v. TRANSCONTINENTAL & WESTERN AIR, Inc.

### No. 7, Civil.

District Court, D. Delaware.

Sept. 24, 1940.

Walter N. Thayer, 3d (of Donovan, Leisure, Newton & Lumbard), of New York City, and Aaron Finger (of Richards, Layton & Finger), of Wilmington, Del., for plaintiffs.

Horace G. Hitchcock and Dwight R. Collin (of Chadbourne, Wallace, Parke & Whiteside), both of New York City, and James R. Morford and Josiah Marvel, Jr. (of Marvel & Morford), both of Wilmington, Del., for defendant.

NIELDS, District Judge.

Action for breach of contract.

Eugene L. Vidal of New York and George Palmer Putnam of California, plaintiffs, filed a complaint against Transcontinental and Western Air, Inc., defendant. The complaint alleges a breach of contract by defendant to sell and deliver four used airplanes. The contract dated April 14, 1937 was executed by plaintiffs and by the president of defendant. A copy of the contract is set forth

in the complaint and in a footnote to this opinion.[1] The complaint alleges that plaintiffs were at all times ready, willing and able to perform their part of the contract; that they had performed all conditions of the contract to be performed by them but that defendant failed and refused to make delivery of the airplanes specified in the contract. General damages in the amount of $120,000 and special damages consisting of expenses in preparation for the operation of the airline, loss of time devoted thereto and loss of profits, in the aggregate amount of $104,500 are claimed. (Loss of profits of $100,000 expected from the operation of the airline, as alleged in one paragraph, were abandoned at the trial.)

---

[1] April 14, 1937.

Messrs. Eugene L. Vidal and George Palmer Putnam,
2 West Forty-fifth Street,
New York, N. Y.

Gentlemen:

The undersigned, Transcontinental & Western Air, Inc., hereby agrees to sell and deliver to you and you agree to purchase from us four (4) Douglas DC–2 airplanes bearing company Nos. 301, 302, 303, and 304 or airplanes of later delivery. Each of such airplanes shall be equipped with two (2) Wright Cyclone engines and other equipment now on such airplanes, except radio equipment, automatic pilots, de-icers, and except detachable parts and supplies as are now used in our passenger service.

The purchase price of each such airplane shall be Ten Thousand Dollars ($10,000), payable in full to us by certified check upon the delivery of the airplanes to you at the Municipal Airport, Kansas City, Missouri. Such delivery and payment shall be made on June 1, 1937, unless on that date we have not received delivery of a sufficient number of Douglas DC–3 or SDT airplanes to enable us to withdraw from service the airplanes to be purchased by you, in which event such airplanes shall be delivered to you and you agree to make payment within five (5) days after notice from us to you that such airplanes are ready for delivery to you, but if we are unable to deliver such airplanes to you on or before July 1, 1937, you shall be privileged to withdraw from this agreement, and all of our respective rights and obligations hereunder shall terminate without any liability of one party to the other.

At the time of delivery of such airplanes to you, we agree to execute such forms as may be necessary in order that the transfer of ownership thereof may conform with the requirements of the Department of Commerce with respect to the sale of airplanes.

In the event that within one (1) year after accepting delivery of such airplanes you receive any acceptable offer to purchase the same or any of them, we shall have the right, at our election, to repurchase from you within fifteen (15) days after notice from you, all or any of the planes covered by such offer at the same price as that offered to you; provided, however, that if such purchase price shall be in excess of Ten Thousand Dollars ($10,000) per airplane, the repurchase price to us shall be Ten Thousand Dollars ($10,000). In the event that we exercise such right of repurchase, such plane or planes shall be delivered to us at the Newark Airport or at any other airport in the New York metropolitan area designated by us, with the same equipment and in the same condition as at the time of delivery to you, wear and tear due to normal use excepted. At such time you will also execute and deliver to us such documents as may be necessary to transfer the ownership thereof to us under the requirements of the Department of Commerce.

It is understood that you are organizing a corporation to be controlled by you for the purpose of carrying on airline operations and that upon the formation of such corporation you may assign to it the right to purchase such airplanes subject to all of the obligations hereof, but neither you nor such corporation shall have the privilege of assigning this agreement to any other person, firm or corporation without our consent in writing.

In consideration of this agreement and of the price at which such planes are to be sold to you by us, you hereby assign to us all of your right, title and interest in and to a certain option agreement between you and the Lockheed Aircraft Corporation entered into during the month of February 1937, under which you have the right and option to purchase three (3) Lockheed Super Electra airplanes, Model 14–H, each equipped with two (2) Pratt & Whitney Series G Hornet engines, at the price of Seventy-two Thousand Dollars ($72,000) per airplane, to be delivered on or about August 25, 1937; provided, however, that if we do not deliver to you on or before July 1, 1937, the Douglas DC–2 airplanes referred to above, all of our rights with respect to said Lockheed Super Electra airplanes shall terminate at your election. You agree to execute any and all other instruments of assignment or oth-

Plaintiff, George Palmer Putnam, was the husband of Miss Amelia Earhart. She was lost July 2, 1937, in an attempt to fly around the earth. In 1937 Putnam's business was "primarily motion picture activities". He was a writer, newspaperman and publisher and had worked for Pan American Airways in public relations work. In ten years association with Miss Earhart he was "often connected with various aeronautical activities". His last employment was in the early part of 1937 as assistant to Emanuel Cohen, head of Major Pictures Corporation.

Plaintiff, Eugene L. Vidal, had been a flying officer in the Army Air Corps and for a short time had been connected with the organization of two airlines. In 1933 he assisted in setting up National Airways with Miss Earhart and others. From 1933 to 1937 he was employed in the United States Department of Commerce and became director of the Bureau of Aeronautics.

Defendant, Transcontinental and Western Air, Inc., is a Delaware corporation with repair shops at the airport in Kansas City, Missouri, and operating an airline extending from the Atlantic to the Pacific. Defendant's Kansas City letterhead reads: "Shortest Route Coast to Coast—Municipal Airport—Kansas City, Mo." For five years Jack Frye had been its president. After organization of defendant in 1930 he had served as Vice President in charge of operations. For seventeen years he had been a pilot. Since 1927 he had been actively engaged in operating airlines.

*Negotiations before April 14, 1937*

Towards the end of 1936 plaintiffs were eager for new fields of employment. They had friends but lacked funds. They decided to approach defendant through a personal and friendly channel. Putnam and his wife being in New York paid a social call upon Edwin L. Weisl, a friend of Miss Earhart and a member of the law firm of Simpson, Thatcher and Bartlett, counsel for Odlum, President of Atlas Corporation, and Hertz, a partner in Lehman Brothers. These gentlemen were holders of less than 10% of the stock of defendant and were neither officers nor directors of defendant. The following day, December 15, Putnam wrote to Weisl: "As requested, this letter is in further reference to our conversation of yesterday regarding the proposed airline shuttle service between Boston and New York. * * * Because of pending legislation and/or possible competition, it is essential to start the service, at least in some modified and temporary form, and as promptly as possible. * * * For this temporary service we assume used Douglas equipment, carrying twenty passengers instead of the present fourteen. * * * Exclusive of flying equipment, $25,000 will be the initial cash requirement to organize and launch the project. An additional $50,000 should be in reserve. The exact cost of the Douglases would be for your associates to determine. Obviously the financial setup can be handled in many ways. What is your idea? * * *."

In January, 1937, the president of defendant was invited to Floyd Odlum's ranch at Indio, California. Besides Mr. and Mrs. Frye there were present Mr. and Mrs. Odlum, Mr. and Mrs. Putnam and Vidal. For several days they discussed plaintiffs' proposal to institute an airline between New York and Boston. The final understanding was that plaintiffs would organize an airline to supply business to defendant and that defendant would sell to a company to be formed by plaintiffs equipment for operating the airline and should have an option to purchase the entire assets of the line.

After this visit to the ranch in California Odlum prepared a draft of a contract between plaintiffs and defendant and sent it to Frye. Frye "passed the papers which were sent to me by Odlum to Mr. Brophy,

---

erwise, which may be necessary in order to vest in us, subject to the conditions above set forth, all of your rights under said option agreement, if after an examination thereof by us such other instruments are desired by us.

If the foregoing clearly recites our understanding, will you kindly cause the original and duplicate original of this letter to be executed under the word "accepted" as it appears below, and the same as so accepted will constitute an agreement between us.

  Very truly yours,

   Transcontinental & Western Air,
    Inc.,
    By (Signed) Jack Frye,
     Jack Frye, President.

Accepted: April   , 1937
 (Signed) E. L. Vidal,
 (Signed) G. P. Putnam."

[member of the firm of Chadbourne, Wallace, Parke and Whiteside] our attorney to check over and give me an opinion on it before we entered into the agreement that was proposed". Brophy inserted a provision that the agreement should not be binding until ratified by defendant's board of directors and should be subject to all laws that might apply. March 16 the agreement so modified was signed by Frye and sent to plaintiffs. The agreement omitted any references to financing and provided for the sale of five planes.

Discussion between Vidal and Frye followed in the latter part of March and early in April. Brophy had advised that to comply with the Air Mail Act, 39 U.S. C.A. § 461 et seq., it would be necessary to eliminate the option and installment provisions. Frye so told Vidal. Since Brophy insisted that the transaction be an outright sale Frye suggested that plaintiffs purchase the planes at $18,000 each. By taking $28,500, the price at which defendant had sold five newer planes to the Braniff Air Lines fully equipped with automatic pilots, de-icers and radio equipment, Frye arrived at the price of $18,000. Vidal told Frye they "could not go that high * * *". Finally Vidal and Frye agreed to reduce the number of planes from 5 to 4, do away with all overhauling and reduce the price to $10,000 each. Thereupon the contract in suit was drafted. It is perfectly clear that Frye's suggestion of $18,000 preceded the contract of April 14, 1937.

### Contract of April 14, 1937

The contract of April 14, 1937 was prepared by Brophy. It was signed by Frye in Washington and sent to New York where it was signed by the plaintiffs. Shortly thereafter changes were made in New York, all parties affixing their initials to the changes.

Under the terms of the contract defendant agreed to sell and deliver to plaintiffs four Douglas DC-2 airplanes, bearing company Nos. 301, 302, 303 and 304 or airplanes of later delivery. These airplanes were to be equipped with regular equipment except automatic pilots, de-icers and radio equipment. The purchase price of each of the airplanes was set at $10,000, to be paid to the defendant upon delivery of the planes to the plaintiffs at the Municipal Airport in Kansas City, Missouri. The delivery of the planes and the payment for them were to be made on June 1, 1937.

We come now to the crux of the case. Defendant's position is twofold:

1. That there was no breach of the contract by defendant.

2. That there was an abandonment of the contract by plaintiffs.

Facts showing that there was never any breach of the contract by the defendant will be discussed first. The delivery clause in the contract was as follows: "The purchase price of each such airplane shall be Ten Thousand Dollars ($10,-000), payable in full to us by certified check upon the delivery of the airplanes to you at the Municipal Airport, Kansas City, Missouri. Such delivery and payment shall be made on June 1, 1937, unless on that date we have not received delivery of a sufficient number of Douglas DC-3 or SDT airplanes to enable us to withdraw from service the airplanes to be purchased by you, in which event such airplanes shall be delivered to you and you agree to make payment within five (5) days after notice from us to you that such airplanes are ready for delivery to you, but if we are unable to deliver such airplanes to you on or before July 1, 1937, you shall be privileged to withdraw from this agreement, and all of our respective rights and obligations hereunder shall terminate without any liability of one party to the other."

Twelve days after the execution of the contract, on April 26, 1937, Frye received a telegram from Putnam as follows: "Can you let us know approximate dates delivery stop information pretty necessary in making plans and announcements. Addresss Two West Forty-fifth street. Regards George Putnam." To which he replied: "Can deliver first ship June 1, and others by July tenth subject no further delays by Douglas. Regards Jack Frye."

The delivery clause of the contract quoted above is altered by this exchange of telegrams. The telegram from Frye definitely sets the delivery dates in the contract. The effect of his telegram is shown in Frye's testimony:

"Q. * * * Was there any change in the date of delivery and payment as provided in the contract? A. The only change that occurred was that shortly after the contract was entered into, the

delays which had already occurred at the Douglas factory due to a strike, seemed to be clarifying, so that on April 26th when Mr. Putnam wired me asking me when we could deliver planes, the delivery situation had cleared up to the point where we were able to state that we could deliver one plane on June 1st and the other planes, I believe by July 10th.

"Q. And is that the occasion of your wire to Mr. Putnam, dated April 26, 1937, Plaintiffs' Exhibit No. 3? A. It is.

"Q. Pursuant to that telegram, was there a DC–2 as called for by the contract, or one of later delivery date to you available in Kansas City on June 1st for delivery to the plaintiffs if they had called for and made payment? A. There was one of these particular planes available.

"Q. That is, 301, 302, 303 or 304? A. Yes.

\* \* \*

"Q. On July 10, 1937, Mr. Frye, were there available in Kansas City for delivery to the plaintiffs not only the three airplanes to be delivered on that date and to be paid for on that date, but also the airplane which the plaintiffs had not called for on June 1st, or airplanes of later date, pursuant to the terms of the contract? A. There were.

"Q. Did the plaintiffs at any time demand delivery of four airplanes or any airplanes under the terms of the contract? A. They did not.

"Q. Did they make any demand for delivery on June 1st? A. They did not.

"Q. Did they make any demand for delivery on July 10th? A. They did not.

"Q. Did they make any demand for delivery any time during June or July? A. They did not."

That definite delivery dates had been set by the telegrams was clearly understood by plaintiffs. In a memorandum of May 13 Putnam says: "Proposition II—Make delivery of planes as agreed in present contract on dates as set forth in J. F's. [Jack Frye's] recent telegram, namely June and July." This shows that Putnam clearly understood that the delivery dates had been specified under the contract in suit and shows that he clearly understood what those dates were and what was required of him and his associate Vidal with respect to taking delivery on those dates.

Vidal admits he had the same understanding. In cross examination he was asked:

"XQ. You asked for a date of delivery by the telegram of April 26 and you were given as the delivery dates June 1st for one and July 10th for three, subject to further delays by Douglas; is that correct? A. That is correct."

Plaintiffs in their brief state: "It is undisputed that T.W.A. had sufficient DC–3s on hand in June and July to enable it to release to the plaintiffs the four DC–2s described in the contract."

At the time that the April 14th contract was executed the strike at the Douglas factory had been settled and after April 14th there was clearly no occasion for any further discussions about strikes.

Shortly after the exchange of telegrams of April 26 and while Frye was in Kansas City he received a telephone call from Vidal. Vidal told Frye he was going to send his chief pilot and maintenance man and a mechanic to Kansas City "to take instruction on the operation of this equipment, to develop [an] operating manual and operating procedures and go through the usual training and checking that is necessary in putting a new type of plane in the service \* \* \*". Frye urged Vidal to send his personnel out for training as soon as possible because the first plane was due on June 1 and it would take most of the month of May to get ready to take delivery of the plane. Frye testified:

"Q. In that conversation was any reference made to the telegram fixing the delivery dates? A. Yes.

"Q. What was said? A. Reference was made particularly to the first plane being due on June 1st, and I urged Mr. Vidal to send his personnel out as soon as possible, because it would take—they should spend most of that month in getting ready to take delivery of this plane and getting the information and training necessary to operate it."

Such training is essential in preparing to operate equipment that is new or strange to the pilots who will fly the planes and the mechanics who will service them. Experienced transport pilots need to be "checked out" over a period of approximately 50 hours of flying after a long and thorough instruction in the design, construction, equipment, installation and operation of the planes. Frye pointed out that when Braniff Airways purchased five DC–2s from defendant it sent two chief pilots to fly over defendant's line as copilots for

over a month and after the month's training the pilots were put through the check-out procedure.

No one ever came to Kansas City for instruction and Frye was never told why they were not sent.

### Plaintiffs' discouragements

Financing the project was always uppermost in the minds of both plaintiffs. April 3 Putnam telegraphed from Los Angeles to Weisl at the Warrick Hotel: "Expect arrive TWA tomorrow Sunday morning proceeding to hotel Barclay stop will phone and if convenient to you want to see you that evening regarding important matter concerning Mannie. Regards. George Putnam." Of this telegram Weisl testified:

"Q. Did he discuss with you what arrangements he had made to finance this operation he proposed to go into? * * *. A. This telegram refers to a 'Mannie'. The Mannie is Mr. Emanuel Cohen who was at that time in charge of producing pictures for the Paramount Pictures Company. My firm was general counsel to the Paramount Pictures Company, and I handled the Paramount work for the firm. Mr. Cohen employed Mr. Putnam in some capacity. Mr. Putnam discussed with Mr. Cohen, as Mr. Putnam stated to me, the investment by Mr. Cohen of some money in this projected airline, and he asked me to recommend to Mr. Cohen his investing money in the airline, and I told Mr. Putnam that I did not believe I could do so. Mr. Cohen had to make up his own mind, and I did not want to influence him as I considered the venture speculative, and I did not want to be held responsible by Mr. Cohen for any recommendation to invest money in the project."

Thus Mr. Emanuel Cohen disappeared as a "prospect" in financing the airline.

In May, Vidal made a bold effort to finance the project as appears from the following episode. Vidal asked one McDonald to raise money for the project. McDonald visited the banking firm of Lehman Brothers and talked with Robert Lehman, the head of the firm. He stated to Lehman that the project involved the purchase of airplanes from defendant at considerably less than they were worth and that the planes could be sold at a substantial profit. McDonald also said that the planes were purchased cheaply through the influence of Odlum, a stockholder of defendant. Lehman reported the McDonald talk to his partner Hertz. Hertz was annoyed and embarrassed because McDonald's statements were not true. The contract was a perfectly fair one and not the result of anyone's influence. Thereupon Hertz requested Weisl to speak to Putnam. After hearing Weisl's statement Putnam said he was embarrassed also. He further said he knew nothing about McDonald but would talk to Vidal. A day or two later Putnam reported to Weisl that he had spoken to Vidal and that Vidal said he asked McDonald to raise money for the project and may have represented it in exaggerated terms. Putnam reported that he wanted to do anything he could to relieve Hertz, Odlum and defendant from embarrassment. He stated to Weisl that he lost enthusiasm for this particular airline and did not agree with Vidal as to the potential profits. Moreover he did not share Vidal's enthusiasm and would like to work out some other plan. Thus the effort of Vidal to raise money was a boomerang. It not only failed but reacted with disaster.

It will be recalled that when negotiations were started in this project by Mr. and Mrs. Putnam in 1936 Putnam wrote in a memorandum: "Because of pending legislation * * * it is essential to start the service * * * as promptly as possible * * *" etc. Vidal was in Washington and in intimate touch with legislation affecting air transportation lines. For some time there had been agitation for a law requiring the operators of non-airmail carriers to secure certificates of convenience and necessity and early in 1937 it was believed that legislation containing such provisions would be passed by Congress. The pending bills provided for granting certificates to lines then in operation. The ownership of such a certificate for an important route, such as New York to Boston, obviously would be of substantial value. Vidal stated that he felt that if the line could be started soon enough—that is, before passage of the pending legislation, it could secure a certificate of convenience and necessity. The importance of this feature in the minds of Vidal and Putnam was admitted by Vidal as follows:

"Q. * * * and was not the existence of the 'Grandfather' clause in the pending legislation that made this proposi-

tion of a new airline peculiarly attractive to you and Mr. Putnam? A. Yes."

When it became apparent, as it soon did, that the legislation would not pass and no franchise or certificate of any value could be obtained by initiating airline service, the project was dropped. In fact it never got beyond a paper stage.

A staggering blow that befell plaintiffs was the tragic death of Miss Amelia Earhart on July 2, 1937. She it was who inspired defendant's interest. Obviously her name connected with an airline would be a big asset. It was hoped that her identification with this airline would help overcome woman's repugnance to flying. Her dramatic flights and colorful life gave great chances for publicity and advertising. Her loss was irreparable.

*Plaintiffs' repudiation and abandonment of their contract*

Frye was in the West most of May but returned East after May 20th. He testified that he was in New York on June 18th for a director's meeting, and Weisl called him on the telephone and said he wanted to arrange a meeting with plaintiffs while Frye was in New York. Weisl said that it looked as if plaintiffs were not interested in continuing their airline proposal but that he felt that they had spent some time and money in attemping to do something that would be helpful to defendant, and he thought that Frye ought to meet them and see if they could work out something to "leave a better taste in their mouth".

The following morning plaintiffs with Weisl breakfasted with Frye at the Ambassador Hotel. Concerning the breakfast discussion Frye testified:

"The meeting was started by Mr. Weisl making the statement that he and Mr. Odlum had been more or less responsible for getting this deal together, and that, for that reason, he felt some responsibility in attempting to get it straightened out, to get the two sides together on a settlement. He said that it appeared that Putnam and Vidal had dropped and were unable to carry on the airline deal. * * * He made the statement which did not deny, that they were not going through with the airline deal. It was an effort on their part to get something from TWA for the time they had spent in it. We never talked about rescinding the contract or considered it.

"By Mr. Morford:

"Q. Did you ever suggest rescinding the contract? A. I did not.

"Q. Did you have in mind rescinding the contract? A. I did not.

"Q. Did you have in mind at all times carrying it out? A. I did, and the planes would have been delivered at any time they asked for them during that period.

"Q. Go ahead, Mr. Frye. A. He [Weisl] said he felt that Putnam and Vidal should turn in to TWA an account of their out-of-pocket expense and an estimate of what their time had been worth on this deal, and that he would urge those members of the TWA Board that he knew, to authorize payment. Putnam and Vidal said that they would like to have an opportunity to work on selling of the planes and to make some money through doing that; and in doing that they felt they might render TWA a service which would be worth more and would give them a profit for the time that they had spent on this thing. I told them that I felt we already had one unpleasant incident in connection with their representation of TWA, and for that reason I felt that an outright payment for their time and efforts would be better, and I did not feel that they should attempt to enter into selling planes. The meeting broke up without any settlement or agreement to either of these things."

Nothing definite was accomplished at the meeting and when it broke up plaintiffs stated that they wanted to explore the matter of selling the planes and see if they could develop an offer which would be acceptable to defendant and give them a chance to make a little money.

Frye heard nothing more about the contract until early in August. Between the first and fifth of August Frye testified that one Babb telephoned him at his New York office. He learned that Babb was a dealer and broker in airplanes. He told him the four airplanes named in the contract were not available to any person other than plaintiffs for a year because of the repurchase clause in favor of defendant contained in the contract. Obviously Babb telephoned to Frye to check with him as to the representations made by plaintiffs. Babb wanted to know whether plaintiffs were in a position to sell to him planes which they claimed to have under contract. No doubt Frye

told Babb that the planes could not be resold for a year. This was true.

We next turn to the long telegram of plaintiffs to Weisl en route to Chicago to try a case. The telegram did not contain a demand for delivery of the planes or ask Weisl for his help in securing delivery. The whole telegram is a plea to Weisl to help plaintiffs put through an entirely new deal, namely, the sale of the planes abroad. The language "Now Frye states will not make delivery before next year" clearly relates to what Frye had told Babb. In the telegram plaintiffs go on to say, "Frye alleges knows nothing our conversation with you regarding possible sale arrangement". Here again plaintiffs are not complaining of any breach of contract by defendant but only of Frye's lack of knowledge of a claimed arrangement with Weisl. Apparently the purpose of this telegram was to make a record of plaintiffs' position. Even at that late date they nowhere demand delivery of the planes or tender payment for the planes or that defendant had refused to deliver the planes in accordance with the contract. The only complaint was that Frye would not help them make some money in a manner wholly foreign to their agreement.

*The Court makes the following findings of fact:*

1. On June 1, 1937, defendant was ready, willing and able to deliver to plaintiffs at the Municipal Airport, Kansas City, Missouri, one of the four airplanes described in the contract in accordance with its terms.

2. After June 1, 1937 and on and prior to July 10, 1937, defendant was ready, willing and able to deliver the four airplanes described in the contract to the plaintiffs at the Municipal Airport, Kansas City, Missouri, in accordance with the terms of the contract.

3. Defendant was at all times ready, willing and able to deliver to the plaintiffs the four airplanes described in the contract in accordance with its terms.

4. Plaintiffs did not on June 1, 1937, or on any other date tender payment for one or any of the airplanes described in the contract.

5. Plaintiffs did not on June 1, 1937, or July 10, 1937, or any other date request delivery of one or any of the airplanes described in the contract.

6. Plaintiffs did not on June 1, 1937, or on any other date subsequent thereto appear at Kansas City for the purpose of taking delivery of one or any of the airplanes described in the contract.

7. At no time did any one on behalf of defendant, state to either plaintiff that defendant would not deliver the airplanes pursuant to the terms of the contract.

8. Edwin Weisl had no authority during 1937 to represent the defendant for the purpose of negotiating any contract or receiving communications, notices or demands from the plaintiffs with respect to any contracts.

*The Court makes the following conclusions of law:*

1. Under the provisions of the contract of April 14, 1937, and the telegrams of April 26, 1937, plaintiffs were obliged to tender to defendant payment for one of the airplanes described in the contract on June 1, 1937, and to tender payment for the other three airplanes on or prior to July 10, 1937.

2. Plaintiffs failed to prove facts excusing them from the necessity of tendering payment for the airplanes described in the contract of April 14, 1937.

3. Defendant was under no obligation under the terms of the contract to give any notice of its readiness to deliver the airplanes described in the contract.

4. Plaintiffs were not excused from making a tender of payment merely because they may have thought the defendant would not perform on the date or dates stipulated. The way for the plaintiffs to show their ability and readiness to fulfill their part of the contract was for them to make a tender of performance on their part.

5. Plaintiffs' failure to demand delivery of the airplanes described in the contract and tender payment therefor constituted an abandonment of the contract.

6. Defendant was at all times ready, willing and able to deliver the airplanes described in the contract in accordance with its terms.

This opinion contains a statement of the essential facts and of the law applicable thereto in accordance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The complaint must be dismissed.